# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 14, 2018     Decided  December 4, 2018

No. 17-1116

NICHOLAS J. BONACCI,
PETITIONER

v.

TRANSPORTATION SECURITY ADMINISTRATION,
RESPONDENT

---

On Petition for Review of Orders of the
Transportation Security Administration

---

*Nicholas J. Bonacci*, *pro se*, argued the cause and filed the briefs for petitioner.

*Michael Shih*, Attorney, U.S. Department of Justice, argued the cause for respondent.  With him on the brief were *Jessie K. Liu*, U.S. Attorney, and *Sharon Swingle*, Attorney.

Before: TATEL, *Circuit Judge*, and EDWARDS and GINSBURG, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: In November 2010, the Transportation Security Administration ("TSA") initiated what

is now labeled as the Known Crewmember Program ("KCP"). The first iteration of the program allowed commercial pilots to enter "sterile areas" of participating U.S. airports without passing through security checkpoints used by passengers. Under the program, pilots were permitted to enter flight arrival and departure areas through designated access points after presenting their employee and government identification to a TSA officer. In some cases, however, a pilot might be randomly selected for additional screening at a passenger checkpoint. In July 2012, TSA announced that it was opening the KCP to flight attendants.

Beginning in 2015, TSA commenced studies and planning to revise airport pat-down procedures. The agency also initiated actions to respond to "insider threats" to security posed by individuals with privileged access to aircraft and secure areas of airports. In March 2017, TSA took final action to replace existing pat-down techniques with a single, more thorough, procedure known as the "universal pat-down." The new pat-down procedures were applicable to both passengers and crewmembers who were randomly selected for screening at passenger checkpoints. On March 29, 2017, TSA issued an updated edition of its Specialized Screening Standard Operating Procedures ("SOP"), and implemented it on April 3, 2017. The new edition of the Specialized Screening SOP includes Known Crewmember Program policies.

*Pro se* petitioner Nicholas Bonacci is a commercial pilot based at Houston's George Bush Intercontinental Airport. On several unspecified occasions in 2017, Bonacci was randomly selected for passenger screening when reporting for his assigned duties. On April 11, 2017, invoking the court's jurisdiction under 49 U.S.C. § 46110(a), Bonacci filed a petition for review to challenge the Known Crewmember Program. Bonacci's principal claim is that TSA lacks statutory

authority to select and screen airline crewmembers in the same manner as passengers.

We hold that Bonacci has standing to challenge TSA's policies and will assume without deciding that his petition for review is timely. However, we conclude that his action fails on the merits. Our decisions have repeatedly recognized TSA's broad statutory authority to protect civil aviation security, as well as the deference we must show to the agency's reasoned decisionmaking. Bonacci has offered no persuasive grounds to depart from established precedent. We therefore deny the petition for review.

## I. BACKGROUND

TSA announced the Known Crewmember Program initiative in a November 2010 press release. *See* Press Release, TSA, Pilot Identity Verification Program Moves Forward (Nov. 19, 2010), *reprinted in* Respondent's Public Redacted Supplemental Appendix ("S.A.") 1–2. In addition to explaining the program's main features, the announcement noted that participants "will also be subject to random screening." *Id.* at 2. The program was launched on a preliminary basis at seven airports in 2011. Press Release, Air Line Pilots Ass'n, Int'l, Enhanced Airline Pilot Security Screening Begins at Boston Logan Airport (Oct. 25, 2011), http://www.alpa.org/news-and-events/news-room/2011-10-25-Enhanced-Pilot-Screening-Boston-Logan.

In July 2012, after a successful trial period with pilots, TSA announced that it would open the program to flight attendants. *See* Press Release, TSA, U.S. Airline Flight Attendants to Get Expedited Airport Screening in Second Stage of Known Crewmember Program (July 27, 2012), *reprinted in* S.A. 13–14. TSA cautioned that it would "always incorporate

random and unpredictable security measures throughout the airport screening process." *Id.* at 13. As of mid-2017, the program operated at seventy-four American airports. TSA, Known Crewmember (KCM) Program (May 2, 2017), *reprinted in* S.A. 137–38.

Any person who enters a sterile area through a standard passenger security checkpoint, including KCP participants, may be subject to physical screening. *See* Br. for Respondent at 8–9. TSA at times uses pat-down searches to look for prohibited items or other threats to security that are concealed underneath individuals' clothing. *See Security Screening*, TSA, https://www.tsa.gov/travel/security-screening (last visited Oct. 26, 2018). Pat-downs are conducted to resolve alarms from primary screening technology, as an alternative to that technology, "for enhanced screening," or as part of "unpredictable security measures." *Id.*

In 2015, an audit by the Department of Homeland Security's Office of the Inspector General found that TSA's existing pat-down protocol, which directed officers to use different types of pat-downs in different situations, could be simplified and made more administrable and effective. *See* Memorandum from Daniel Ronan, Dir., Operations Performance Div., to Darby LaJoye, Assistant Adm'r, Office of Sec. Operations (Nov. 28, 2016), *reprinted in* S.A. 98–99. In 2016, TSA began taking steps to implement the report's recommendations. *See id.*

At the same time that it was studying and planning to revise its pat-down procedures, TSA was also taking action to respond to "insider threats" to security posed by individuals with privileged access to aircraft and secure areas of airports. *See* Decl. of Roderick Allison at ¶¶ 44–53, *Mohamed v. Lynch*, No. 11-cv-0050 (E.D.V.A. Mar. 2, 2016), *reprinted in* S.A. 79–

82. Two specific events heightened concerns about the insider threat during this period. First, in December 2014, authorities discovered a gun-smuggling operation run by airline employees at Hartsfield-Jackson Atlanta International Airport. *Id.* at 81–82. Second, in February 2016, a passenger on a flight leaving Mogadishu, Somalia detonated a bomb that he apparently received in the sterile area of the airport from a person dressed as an airport employee. *Id.* at 69–70.

Shortly after the Mogadishu incident, TSA updated a memorandum on insider threats, writing that "[r]ecent events highlight potential airport security vulnerabilities that could be exploited for terrorist or criminal activity." Eddie D. Mayenschein, TSA, Info. Circular IC 15-01B, Insider Threat 1 (Feb. 9, 2016), *reprinted in* S.A. 37–40. In its brief to this court, TSA points to both the Atlanta and Mogadishu incidents as examples supporting its "judgment" that the insider threat "is not hypothetical" and, thus, that "random screening [of crewmembers] is necessary." Br. for Respondent at 5.

In March 2017, TSA responded to both its greater awareness of insider threats and issues with its pat-down procedures by adjusting the screening policies that it employs for individuals seeking to enter airport sterile areas. TSA first replaced its existing set of pat-down techniques with a single procedure known as the "universal pat-down," a more comprehensive and thorough physical search. Br. for Respondent at 10. According to TSA, adoption of the universal pat-down did not change the circumstances under which pat-downs are administered but simply the technique used when a pat-down occurs. *Id.*

TSA also issued an updated edition of its Specialized Screening Standard Operating Procedures. The Specialized Screening SOP is one of several internal agency policy

manuals setting forth TSA's uniform practices, including those governing the screening process for individuals to gain access to the sterile area of an airport. *See Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 3 (D.C. Cir. 2011). Pursuant to statutory authority, the agency has designated its SOPs as nonpublic Sensitive Security Information (SSI). *See* 49 U.S.C. § 114(r)(1) (2012); 49 C.F.R. pt. 1520 (2017). On March 29, 2017, TSA released a new edition of the Specialized Screening SOP, which contains Known Crewmember Program policies; the agency implemented it on April 3, 2017. *See* Br. for Respondent at 7, 26; TSA, Specialized Screening Standard Operating Procedures (Mar. 29, 2017), *reprinted in* S.A. 112–19. As with all revisions to TSA's SOPs, the new policy was issued without notice and comment and without publication in the Federal Register.

Bonacci filed a petition for review on April 11, 2017. He asserts, and TSA does not contest, that he was selected and sent to the passenger screening checkpoint several times when attempting to use a KCP access point at the Houston airport in 2017. Br. for Petitioner at 3–4.

## II. ANALYSIS

### A. Standard of Review

"Pursuant to the Administrative Procedure Act, we must uphold TSA's decisions unless they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Olivares v. TSA*, 819 F.3d 454, 462 (D.C. Cir. 2016) (quoting 5 U.S.C. § 706(2)(A)). "And in applying this standard of review, we remain mindful that, because Congress has entrusted TSA with broad authority over 'civil aviation security,' it is 'TSA's job—not . . . ours—to strike a balance between convenience and security.'" *Amerijet Int'l, Inc. v.*

*Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (quoting *Suburban Air Freight, Inc. v. TSA*, 716 F.3d 679, 683 (D.C. Cir. 2013) (citations omitted)).

## B. Threshold Issues

### 1. *Standing*

In order to challenge the TSA policies governing Known Crewmember Program screening, Bonacci must have Article III standing. To establish standing to seek review of agency action, a petitioner bears the burden of proof "to show a 'substantial probability' that it has been injured, that the defendant caused its injury, and that the court could redress that injury." *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002) (quoting *Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 63 (D.C. Cir. 2000) (per curiam)).

"The Supreme Court has stated," however, that "'there is ordinarily little question' that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated." *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992)). A "petitioner's standing to seek review of administrative action is [usually] self-evident . . . if the complainant is 'an object of the action (or forgone action) at issue . . . .'" *Sierra Club*, 292 F.3d at 899–900 (quoting *Lujan*, 504 U.S. at 561); *see also Nat'l Ass'n of Home Builders v. EPA*, 786 F.3d 34, 43 (D.C. Cir. 2015) (explaining "regulated entities' standing to challenge the rules that govern them is normally not an issue") (internal quotation marks omitted).

Bonacci plainly has standing to pursue his claims in this case. As TSA acknowledges, Bonacci is challenging the

agency's policies "for expediting the screening of pilots and flight attendants." Br. for Respondent at 3. And it is undisputed that, since the KCP was updated in March 2017, Bonacci has been made subject to TSA's pilot and flight attendant screening program. He is an "object of the action" at issue, so there is "little question that [it] has caused him injury, and that a judgment preventing . . . the action will redress it." *Sierra Club*, 292 F.3d at 900 (quoting *Lujan*, 504 U.S. at 561–62).

TSA challenges Bonacci's standing by pointing to a statement in his petition for review that says that he "is not harmed, per se, by enhanced searching." Br. for Respondent at 16, 21, 26 (quoting Petition for Review at 8, *Bonacci v. TSA*, No. 17-1116 (D.C. Cir. Apr. 11, 2017)). In our view, it would be inappropriate to treat these innocuous words as a fatal concession, as TSA would have it, in light of our "obligation to construe pro se filings liberally." *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 583 (D.C. Cir. 2002); *see also Richardson v. United States*, 193 F.3d 545, 548 (D.C. Cir. 1999). In sum, Bonacci's alleged injuries are sufficiently concrete and particularized, *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016), to support his standing in this case. His alleged injuries are caused by TSA's polices, and those injuries would be redressed by a favorable court ruling. We therefore reject TSA's claim that Bonacci lacks standing.

### 2. *Timeliness*

Under 49 U.S.C. § 46110(a), petitions for review of TSA orders must be filed "not later than 60 days after the order is issued." We have interpreted this provision to mean that "the filing period begins to run on the date the order is officially made public." *Avia Dynamics, Inc. v. FAA*, 641 F.3d 515, 519 (D.C. Cir. 2011). TSA concedes that Bonacci's challenge to the universal pat-down procedure is timely. Br. for Respondent at

12. The agency argues, however, that Bonacci's challenge to TSA's policy of randomly designating participants in the Known Crewmember Program for additional screening is untimely because the disputed policy was initiated in 2010. *See id.* at 14–15. We need not decide whether we agree with TSA's framing of the issues, because there is no good reason for us to decide whether Bonacci's challenge is timely.

We have several concerns about applying the time bar here given the peculiar circumstances of this case. First, it is not clear that the agency itself ever issued an official public notice of the KCP when it was first adopted, as is traditionally done when an agency issues a rule after a rulemaking or an order after an adjudication. Second, there is no indication that Bonacci had any actual notice of the KCP when it was first promulgated, which is not necessary but adds to our concerns. Third, it is undisputed that the agency deliberated and then changed its policies affecting screening of both crewmembers and the public within the 60-day period preceding Bonacci's April 11, 2017 petition for review.

In any case, we need not decide the timeliness question because the § 46110(a) deadline is not jurisdictional, *Avia Dynamics, Inc.*, 641 F.3d at 519, and therefore it need not be addressed before we address the merits. Therefore we will simply assume without deciding that the petition is timely and move on to the merits.

## C.  Merits

On the merits, Bonacci's claims fail. He asserts that TSA lacks statutory authority to subject airline crewmembers to "passenger screening," including pat-downs, and that regulations establishing such policies are therefore arbitrary and capricious and unlawful under the Administrative

Procedure Act. Br. for Petitioner at 4–5, 22–24. We disagree. Congress plainly has given TSA such authority and we accord substantial deference to TSA's judgments in carrying out its statutory mandate.

As TSA correctly asserts, an array of statutes provide sufficient authority for the agency to screen Known Crewmember Program participants in the manner it has currently chosen. To begin, Congress has made TSA responsible for "security in all modes of transportation," 49 U.S.C. § 114(d), including "civil aviation security," *id.* § 114(d)(1). The Administrator of the agency must "assess current and potential threats to the domestic air transportation system," *id.* § 44904(a), and "shall take necessary actions to improve domestic air transportation security," *id.* § 44904(e). The agency must also "develop policies, strategies, and plans for dealing with threats to transportation security," *id.* § 114(f)(3), "oversee the implementation, and ensure the adequacy, of security measures at airports and other transportation facilities," *id.* § 114(f)(11), and "carry out such other duties, and exercise such other powers, relating to transportation security as the Administrator considers appropriate, to the extent authorized by law," *id.* § 114(f)(16). Congress explicitly delegated TSA authority "to issue, rescind, and revise such regulations as are necessary to carry out the functions of the Administration," *id.* § 114(*l*), including "regulations to protect passengers and property . . . against an act of criminal violence or aircraft piracy," *id.* § 44903(b).

We need not delineate the precise scope of the authority granted by these statutes. We simply conclude that together they provide more than sufficient grounds for TSA to randomly select airline crewmembers for screening at passenger checkpoints, including using comprehensive pat-downs, as a means of addressing threats to aviation security. Furthermore,

no statutory or regulatory provision bars TSA from enacting and executing these policies. We reject Bonacci's argument that 49 U.S.C. § 44901, which does not mention crewmembers when it instructs TSA to "provide for the screening of all passengers and property . . . that will be carried aboard a passenger aircraft," should be read to prohibit passenger-style screening of pilots and flight attendants. *See* Br. for Petitioner at 24–25 (citing 49 U.S.C. § 44901(a)). There is no evidence that § 44901 limits or repeals the authority provided by the statutes noted above, none of which Bonacci addresses.

To the extent that Bonacci challenges TSA's policy choices in implementing its statutory authority, we must reject these claims as well. "[I]n cases of this sort, we must defer to TSA actions that reasonably interpret and enforce the safety and security obligations of the agency." *Olivares*, 819 F.3d at 462. "[W]e remain mindful that, because Congress has entrusted TSA with broad authority over 'civil aviation security,' it is 'TSA's job—not . . . ours—to strike a balance between convenience and security.'" *Amerijet Int'l, Inc.*, 753 F.3d 1350 (quoting *Suburban Air Freight, Inc.*, 716 F.3d at 683 (citations omitted)). "[C]ourts do not second-guess expert agency judgments on potential risks to national security," but rather "defer to the informed judgment of agency officials whose obligation it is to assess [such] risks." *Olivares*, 819 F.3d at 462.

Applying this deferential standard of review, we find no aspect of the current Known Crewmember Program to which participants are subject that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A)). For instance, Bonacci objects to TSA's decision to screen crewmembers differently from airport employees. Assuming that TSA in fact screens crewmembers more stringently – which TSA disputes – we

decline to second-guess TSA's decision to do so. Just as in *Jifry v. FAA*, in which we upheld TSA's procedures for revoking foreign pilots' permission to fly in the United States, "[i]t is self-evident that the regulations [at issue in this case] are related to the TSA's . . . goals of improving the safety of air travel." 370 F.3d 1174, 1180 (D.C. Cir. 2004). "[T]he court [is not] in a position to second-guess [TSA's] judgment that imposing stricter procedures for coordinating security risks . . . [is] necessary to further that goal." *Id.*

As TSA contends, it has reasonably concluded that a random-screening regime is required to protect airline travelers from the unique threat posed by insiders with privileged access to airport sterile areas. Br. for Respondent at 24. Recognizing the limits of our review, and seeing no persuasive evidence that TSA's policies are unauthorized or otherwise impermissible, we decline to overturn the agency's reasoned decisionmaking.

### III. CONCLUSION

For the reasons set forth above, the petition for review is denied.

*So ordered.*