# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Submitted October 13, 2021          Decided December 10, 2021

No. 21-1074

JONATHAN CORBETT,
PETITIONER

v.

TRANSPORTATION SECURITY ADMINISTRATION AND DAVID P.
PEKOSKE, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF
THE TRANSPORTATION SECURITY ADMINISTRATION,
RESPONDENTS

———

On Petition for Review of Orders of the
Transportation Security Administration

———

*Jonathan Corbett*, pro se, was on the briefs for petitioner.

*Brian M. Boynton*, Acting Assistant Attorney General, U.S. Department of Justice, and *Jennifer L. Utrecht* and *Daniel Tenny*, Attorneys, were on the brief for respondents.

Before: HENDERSON and TATEL, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

Dissenting Opinion filed by *Circuit Judge* HENDERSON.

EDWARDS, *Senior Circuit Judge*: In January 2021, in response to the ongoing COVID-19 pandemic, the Transportation Security Administration ("TSA") issued several directives and an emergency amendment mandating that masks be worn in airports, on commercial aircraft, and on surface transportation such as buses and trains ("Mask Directives"). In February 2021, pro se petitioner Jonathan Corbett ("Petitioner" or "Corbett"), a frequent flyer, filed a petition for review pursuant to 49 U.S.C. § 46110(a) to challenge the Mask Directives. Corbett does not challenge the wisdom of a government agency requiring face masks in airports and on airplanes. Rather, he claims that TSA had no authority to issue the Mask Directives.

In support of his claim, Corbett's central argument is that TSA's statutory authority under the Aviation and Transportation Security Act, Pub. L. No. 107-71, 115 Stat. 597 (2001) (codified in 49 U.S.C. § 114 and scattered sections of 49 U.S.C.) ("Act"), is limited to developing policies and promulgating directives to protect against violent threats to transportation and ensure the security of airports and other transportation facilities against criminal attack. According to Corbett, this authority does not empower TSA to require face masks to prevent the spread of COVID-19. Corbett contends that TSA's Mask Directives purport to regulate general health and safety, not transportation security. Therefore, in his view, TSA's Mask Directives are *ultra vires*.

Because we find no merit in Corbett's claim, we deny the petition for review. The COVID-19 global pandemic poses one of the greatest threats to the operational viability of the transportation system and the lives of those on it seen in decades. TSA, which is tasked with maintaining transportation

safety and security, plainly has the authority to address such threats under both sections 114(f) and (g) of the Aviation and Transportation Security Act. *See* 49 U.S.C. § 114(f), (g).

## I. BACKGROUND

In the wake of the deadly September 11, 2001, terrorist attacks, Congress created TSA to safeguard this country's civil aviation security and safety. 49 U.S.C. § 114; *see Alaska Airlines, Inc. v. TSA*, 588 F.3d 1116, 1117-18 (D.C. Cir. 2009) (citing 49 U.S.C. § 114). The Act confers upon the agency broad authority to "assess threats to transportation" and "develop policies, strategies, and plans for dealing with" such threats. 49 U.S.C. § 114(f)(2), (3). This authority extends to "ensur[ing] the adequacy[] of security measures at airports and other transportation facilities," as well as "work[ing] in conjunction with the . . . Federal Aviation Administration with respect to any actions or activities that may affect aviation safety or air carrier operations." *Id.* § 114(f)(11), (13). "[T]o carry out the functions of the [TSA]," the agency "is authorized to issue, rescind, and revise such regulations as are necessary." *Id.* § 114(*l*)(1).

The global COVID-19 pandemic has, to date, resulted in the deaths of more than 750,000 persons in the United States. Centers for Disease Control and Prevention, *COVID Data Tracker Weekly Review*, http://go.usa.gov/x6Zge (last visited Nov. 22, 2021). When President Biden assumed office, he issued an Executive Order directing agencies, including TSA, to "immediately take action . . . to require masks to be worn" in airports, on airplanes, and on buses and trains. Exec. Order No. 13,998, 86 Fed. Reg. 7205, 7205 (Jan. 21, 2021), *reprinted in* Supplemental Appendix ("S.A.") 1 ("Executive Order"). The President said that the action was critical "to save lives and allow all Americans, including the millions of people

employed in the transportation industry, to travel and work safely." *Id.*

On January 27, 2021, the Acting Secretary of the Department of Homeland Security determined that the COVID-19 pandemic constitutes a "national emergency." *See* Determination of a National Emergency Requiring Actions to Protect the Safety of Americans Using and Employed by the Transportation System, 86 Fed. Reg. 8217, 8218, 8219 (Feb. 4, 2021), *reprinted in* S.A. 5-6. This determination reaffirmed determinations that had been made by the Executive Branch dating back to March 2020. *Id.* at 8218. The January 2021 determination found that the pandemic was "a threat to our health and security" and "a threat to transportation." *Id.* at 8218, 8219. The Secretary directed TSA "to take actions consistent with the authorities in [the Act] . . . to implement the Executive Order to promote safety in and secure the transportation system." *Id.* at 8218. This included any measures "necessary to protect the transportation system . . . from COVID-19 and to mitigate [its] spread . . . through the transportation system." *Id.* at 8218-19.

In response to the emergency determination, TSA issued several security directives and an emergency amendment mandating that masks be worn in airports, on commercial aircraft, and on surface transportation such as buses and trains. Security Directives Nos. 1582/84-21-01, 1542-21-01, 1544-21-02, *reprinted in* S.A. 13-26; Emergency Amendment 1546-21-01, *reprinted in* S.A. 27-31 (collectively, "Mask Directives"). The Mask Directives instruct airport operators, domestic aircraft operators, foreign air carriers, and surface transportation operators to require passengers and employees to wear a mask "covering the nose and mouth" "at all times" while in transportation hubs and on conveyances. *See, e.g.*, Security Directive No. 1542-21-01 at 2, *reprinted in* S.A. 19.

Children under two, people with disabilities who cannot wear a mask, or workers for whom a mask would create a risk to workplace health or safety are exempt from the mandate. *See, e.g.*, *id.* at 3, *reprinted in* S.A. 20. In addition, the Mask Directives provide exceptions to the mask requirement for "eating, drinking, or taking oral medications for brief periods," "for identity verification purposes," or "while communicating with a person who is deaf or hard of hearing." *See, e.g.*, *id.* at 2-3, *reprinted in* S.A. 19-20.

Airport and aircraft operators are required to notify passengers of the mask requirements and ask them to put on a mask if they are not wearing one. *See, e.g.*, *id.* at 2, *reprinted in* S.A. 19. Passengers who refuse to comply must be denied boarding, removed from the aircraft or airport, and reported to TSA. *See, e.g.*, *id.* at 2, 4, *reprinted in* S.A. 19, 21; Security Directive No. 1544-21-02 at 2, 4, *reprinted in* S.A. 23, 25. These passengers may face penalties of between $500 to $1,000 for first-time offenders and $1,000 to $3,000 for second-time offenders. *See* TSA, *Penalty for Refusal to Wear a Face Mask*, https://www.tsa.gov/coronavirus/penalty-mask (last visited Nov. 14, 2021).

In a separate action, the Centers for Disease Control and Prevention ("CDC") issued its own order that also requires passengers and employees to wear face masks in and on the transportation system. *See* Requirement for Persons To Wear Masks While on Conveyances and at Transportation Hubs, 86 Fed. Reg. 8025, 8029 (Feb. 3, 2021) ("CDC Order") *reprinted in* S.A. 11. The CDC Order and TSA Mask Directives overlap in some respects, but there are differences. For example, while they both permit removing masks for "brief periods" to eat or drink, TSA's directives additionally specify that masks must be worn "between bites and sips" of food and drink. *See, e.g.*, *id.* at 8027; Security Directive No. 1544-21-02 at 3, *reprinted in*

S.A. 24. The TSA Mask Directives also require operators to report incidents of noncompliance to TSA and carry the potential for civil penalties. *See, e.g.*, Security Directive No. 1544-21-02 at 2, 4, *reprinted in* S.A. 23, 25.

On February 26, 2021, Corbett filed a timely petition for review of the TSA Mask Directives pursuant to 49 U.S.C. § 46110(a). Section 46110(a) permits any person with "a substantial interest in an order" issued by TSA "with respect to security duties and powers . . . [to] apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business." 49 U.S.C. § 46110(a). The reviewing court has "exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order." *Id.* § 46110(c).

Petitioner Jonathan Corbett is a frequent flyer who has "flown several hundred thousands of miles in the past decade, including at least a dozen flights during the 'pandemic period' of the last 12 months." Corbett Affirmation, Br. of Pet'r, Ex. A, at 1. Corbett "intend[s] to continue this rate of travel" and has "a currently-booked flight in the near future." *Id.*; Br. of Pet'r 7. As a result of his frequent travel, Corbett says that he is subject to the TSA Mask Directives "dozens of times annually." Br. of Pet'r 7. Corbett further alleges that, "[b]ut for" the TSA Mask Directives, "[he] would wear a mask at fewer times." Corbett Affirmation 1.

The essence of Corbett's petition for review is that TSA has no statutory authority to address the threat that the COVID-19 global pandemic poses to the nation's transportation systems. The petition for review challenges the three security directives and one emergency amendment issued by TSA on

January 31, 2021, with an effective date of February 1, 2021. Br. of Resp'ts 3; *see* Security Directive No. 1542-21-01, *reprinted in* S.A. 18-21; Security Directive No. 1544-21-02, *reprinted in* S.A. 22-26; Security Directive No. 1582/84-21-01, *reprinted in* S.A. 13-17; and Emergency Amendment No. 1546-21-01, *reprinted in* S.A. 27-31. The initial Mask Directives expired May 11, 2021, but they have since been extended multiple times. *See* Resp'ts' 28(j) Letter (Aug. 30, 2021). The current Mask Directives that are under review here are in effect through January 18, 2022. *See* Security Directive Nos. 1542-21-01B, 1544-21-02B, and 1582/84-21-01B; Emergency Amendment No. 1546-21-01B, *reprinted in* Attach. to Resp'ts' 28(j) Letter (Aug. 30, 2021). Corbett urges the court to hold that the Mask Directives are *ultra vires*, *i.e.*, beyond the scope of TSA's lawful authority, and enjoin TSA from enforcing them. Br. of Pet'r 18-19; *see Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Hum. Servs.*, 830 F.3d 515, 522 (D.C. Cir. 2016) (holding that "[t]o challenge agency action on the ground that it is *ultra vires*, [the complaining party] must show a 'patent violation of agency authority.'" (quoting *Indep. Cosmetic Mfrs. & Distribs. Inc. v. U.S. Dep't of Health, Educ. & Welfare*, 574 F.2d 553, 555 (D.C. Cir. 1978))).

On the same day when he filed his petition for review, Corbett filed an emergency motion for stay pending review of the directives. Emergency Mot. for Stay Pending Review 10-11. This court denied the motion for stay on March 26, 2021. Order (Mar. 26, 2021).

Corbett's petition challenges only the actions of TSA, not the CDC. In addition, one of the directives that is referenced in Corbett's petition for review applies only to masking on surface transportation services such as buses and trains. *See* Security Directive No. 1582/84-21-01, *reprinted in* S.A. 13-17. However, this directive is not challenged in Corbett's briefs.

Therefore, we will limit our review of Petitioner's claims to TSA's mask requirements in airports and on airplanes.

## II. ANALYSIS

### A. Standing

In order to challenge a disputed government regulation, a petitioner must satisfy "the irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Corbett clearly does. As we explained in *Bonacci v. TSA*, 909 F.3d 1155 (D.C. Cir. 2018):

> To establish standing to seek review of [a TSA] action, a petitioner bears the burden of proof "to show a 'substantial probability' that it has been injured, that the defendant caused its injury, and that the court could redress that injury." *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002) (quoting *Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 63 (D.C. Cir. 2000) (per curiam)).

> "The Supreme Court has stated," however, that "'there is ordinarily little question' that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated." *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992)). A "petitioner's standing to seek review of administrative action is [usually] self-evident . . . if the complainant is 'an object of the action (or forgone action) at issue. . . .'" *Sierra Club*, 292 F.3d at 899–900 (quoting *Lujan*, 504 U.S. at 561); *see also Nat'l Ass'n of Home Builders v. EPA*, 786 F.3d 34, 43 (D.C. Cir. 2015) (explaining "regulated entities' standing to challenge

the rules that govern them is normally not an issue")
(internal quotation marks omitted).

*Bonacci*, 909 F.3d at 1159-60.

As a directly regulated party, Corbett plainly has standing to pursue his claims in this case. The Government does not deny that, absent a permissible regulation compelling him to do so, Corbett has every right to choose whether and when to wear a face mask in an airport – just as he can choose what clothing to wear in an airport. Each time Corbett flies, he is forced to comply with the TSA directives to wear a mask almost continuously. Because he is the target of the TSA regulations, he faces the threat of enforcement and ensuing penalties should he fail to comply. Corbett has made clear that, were it not for the TSA regulations, he would not wear a mask in accordance with the TSA requirements. Reply Br. of Pet'r 6. (Petitioner "would engage in conduct prohibited by the order but for the order."). In addition, Corbett's injury is not "conjectural" or "hypothetical": he is a frequent flyer and he currently has future travel booked where he will again face compelled compliance with the Mask Directives under the credible threat of enforcement. *See* Br. of Pet'r 7; *Lujan*, 504 U.S. at 560, 563-64.

Like the pilot in *Bonacci*, who had standing to challenge TSA screening procedures that he was subject to, it is undisputed that Corbett is regularly subject to the challenged TSA Mask Directives. *See Bonacci*, 909 F.3d at 1160. Corbett does not allege "unlawful regulation or lack of regulation of *someone else*," in which case "much more [would be] needed" to establish standing. *Lujan*, 504 U.S. at 562 (emphasis in original). Rather, he is within the regulated class of persons covered by the disputed directives, and those directives are plainly ripe for review. The Mask Directives are "directed at

[Petitioner] in particular; [they] require[] [him] to make significant changes in [his] everyday [travel] practices; [and] if [he] fail[s] to observe the [TSA]'s rule [he is] quite clearly exposed to the imposition of . . . sanctions." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 154 (1967). His claims are ripe for review because "[e]ither [Corbett] must comply with [the Mask Directives] . . . or [he] must follow [his] present course and risk prosecution." *Id.* at 152 (citation omitted).

Moreover, because Corbett is directly regulated by the agency's Mask Directives, he is not pursuing a "generalized grievance" that would undercut his standing. The Supreme Court has made it clear that "it does not matter how many persons have been injured by [a] challenged action, [so long as] the party bringing suit . . . show[s] that the action injures him in a concrete and personal way." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007). Corbett has himself been denied the ability to choose whether and when to wear a mask in transit.

TSA contends that the Mask Directives have not caused Petitioner's injury because "[t]he obligation to wear a mask in transportation hubs and on conveyances originates" not with TSA, but with the CDC Order or local law. Br. of Resp'ts 27. This argument borders on frivolous. TSA issued *its own* mandate that it claims it is authorized to do under *its own* statutory authority. However slight the differences may be, its Mask Directives are not a one-for-one fit with the CDC Order as far as scope, *see* Motion for Stay Pending Review 3, 4, n.3, and they indisputably carry new and distinct penalties. Merely because other agencies have similar regulations does not preclude Corbett from challenging the TSA Mask Directives. *See Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 993 (9th Cir. 2012) (A challenger is "not required to solve all roadblocks simultaneously and is entitled to tackle one roadblock at a time."). Setting aside the TSA Mask Mandates would provide

Petitioner clear relief and thus there is an injury that the court can redress.

In sum, as an "object of the action . . . at issue," there is "little question" that the TSA directives "ha[ve] caused [Corbett] injury, and that a judgment preventing . . . the action will redress it." *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002) (quoting *Lujan*, 504 U.S. at 561-62).

**B. Standard of Review**

Our review of Petitioner's claim is governed by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron* step one, we must first decide "whether Congress has directly spoken to the precise question at issue." *Id.* at 842; *see also Kingdomware Techs., Inc. v. United States*, 579 U.S. 162,171 (2016) ("[W]e begin with the language of the statute. If the . . . language is unambiguous and the statutory scheme is coherent and consistent . . . [t]he inquiry ceases." (second alteration in original) (internal quotation marks and citation omitted)). If the statutory provisions in question are "silent or ambiguous with respect to the specific issue," we then assess the matter pursuant to *Chevron* step two to determine whether the agency's interpretation "is based on a permissible construction of the statute." 467 U.S. at 843. "A precondition to deference under *Chevron* is a congressional delegation of administrative authority." *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649 (1990) (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)). However, *Chevron* directs courts to accept an agency's reasonable resolution of an ambiguity in a statute that the agency administers. And because a "new application of a broad statutory term" can always "be reframed" as an expansion of agency authority, "the question in every case is, simply, whether the statutory text forecloses the agency's assertion of authority, or not." *City of Arlington v.*

12

*FCC*, 569 U.S. 290, 300-01 (2013) (citing EDWARDS & ELLIOTT, FEDERAL STANDARDS OF REVIEW 146 (2007)).

Two very important considerations come into play in our review of TSA's actions in this case. First, it is clear from the terms of the Act that "Congress has entrusted TSA with broad authority over 'civil aviation security.'" *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (citing 49 U.S.C. §§ 114(d)(1), (f)(10), (*l*)(1), 44901(f)); *Bonacci v. TSA*, 909 F.3d 1155, 1161 (D.C. Cir. 2018). The agency's authority to enforce its "safety and security obligations" is not rigidly cabined. *Olivares v. TSA*, 819 F.3d 454, 462 (D.C. Cir. 2016) (citing *Suburban Air Freight, Inc. v. TSA*, 716 F.3d 679, 683 (D.C. Cir. 2013)). Second, the directives at issue are the product of "expert agency judgments," *id.*, regarding TSA's assessments of possible "threats to transportation," 49 U.S.C. § 114(f)(2). Therefore, it is not the court's role to second-guess TSA's judgments in carrying out its statutory mandate. *See Jifry v. FAA*, 370 F.3d 1174, 1180 (D.C. Cir. 2004).

## C. The Limits of Petitioner's Challenge to TSA's Regulatory Authority

It is noteworthy that Petitioner does not contend that TSA's determinations regarding the seriousness of the threats posed by COVID-19 are unreasonable. Nor does he contend that TSA's enforcement of its directives somehow runs afoul of the arbitrary-and-capricious standard under the Administrative Procedure Act. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983). "Normally, an agency rule would be arbitrary and capricious if the agency has [1] relied on factors which Congress has not intended it to consider, [2] entirely failed to consider an important aspect of the problem, [3] offered an

explanation for its decision that runs counter to the evidence before the agency, or [4] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*. at 43. Petitioner has not advanced any such claims.

Therefore, any such challenges to the legality of the Mask Directives as they might be applied in any particular case are not before the court. Petitioner's only claim in this case is that TSA has no authority whatsoever to issue the Mask Directives. And any claims by Petitioner that TSA *might* act unreasonably in enforcing the Mask Directives are not ripe for review. *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985))).

**D. TSA's Regulatory Authority**

Petitioner does not question TSA's authority to ensure transportation and civil aviation security. Br. of Pet'r 11. His principal contention is that the term "security," as used by Congress in the Aviation and Transportation Security Act, was meant only to reference preventing "an act of criminal violence, aircraft piracy, and the introduction of an unauthorized weapon, explosive, or incendiary [onto] an aircraft." *Id.* at 13 (quoting 49 C.F.R. § 1542.101(a)(1)). Petitioner argues that directives aimed at preventing or mitigating the effects of COVID-19 involve only matters of public health, *i.e.*, matters related to "safety," not "security." *Id.* at 12; Reply Br. of Pet'r 7-8. He maintains that TSA cannot regulate to contain COVID-19 because doing so falls outside the agency's limited mandate to secure the transportation system against violent attack.

This extraordinarily narrow view of the Act does not withstand scrutiny. Petitioner contends that "security" entails only protection against intentional attack, while "safety" is protection against natural or accidental causes. Reply Br. of Pet'r 7. This framing is belied by the text of the Act, which uses the terms in concert. *See, e.g.*, 49 U.S.C. §§ 44903(b)(3)(A), (e), (h)(3), (h)(4)(C), 44901(h), 44902(b), 44905(b), 46111(a). The Act certainly does not limit TSA's authority to "security" concerns. For example, in defining TSA's duties and powers, the Act states that TSA shall "work in conjunction with the . . . Federal Aviation Administration with respect to any actions or activities that may affect aviation safety or air carrier operations." *Id.* § 114(f)(13). To the extent there is any difference in the words, TSA has established that COVID-19 qualifies as a threat to both safety and security.

Furthermore, in describing its general functions, Congress gave TSA "broad authority to assess potential risks to aviation and national security" and respond to those risks. *Olivares v. TSA*, 819 F.3d 454, 466 (D.C. Cir. 2016); 49 U.S.C. § 114(f)(2) (stating that TSA shall "assess threats to transportation"), (3) (stating that TSA shall "develop policies, strategies, and plans for dealing with threats to transportation security"). In addition, Congress conferred upon the agency an expansive power to act in relation to the transportation system during a national emergency. 49 U.S.C. § 114(g). In light of the language of the Act, it cannot seriously be doubted that Congress' delegations of authority to TSA authorize the Mask Directives issued to contain the spread of the COVID-19 virus.

The simple point here is that "Congress created the [TSA] to assess and manage threats against air travel." *Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 241 (2014). Decisions from this court have consistently confirmed that TSA has

"*broad* statutory authority to protect civil aviation security." *Bonacci v. TSA*, 909 F.3d 1155, 1157 (D.C. Cir. 2018) (emphasis added). Fulfilling this mandate requires, at its core, that TSA identify "threats to transportation" and take the appropriate steps to respond to those threats. 49 U.S.C. § 114(f)(2), (3). Threats may include "security" issues, narrowly defined, and/or "safety and security," more broadly construed. *Olivares*, 819 F.3d at 462 (explaining that TSA is charged to address issues concerning "safety and security").

In crafting the Act, Congress knew how to circumscribe TSA's authority in plain terms if that was the intent of the legislature. *City of Arlington*, 569 U.S. at 296. However, as indicated above, Congress instead used capacious terms to define TSA's authority. Rather than restricting TSA to preventing violent attack, as Petitioner contends, Congress selected broad language in its mandate to the agency. The Act also emphasizes TSA's ongoing duty to perform "research and development activities" in relation to civil aviation security and safety and "order[s] air carriers to modify training programs . . . to reflect new or different security threats." 49 U.S.C. §§ 44918(a)(7), 114(d)(1), (f)(8).

If there is any ambiguity in this expansive grant of authority to TSA, there is "a presumption that Congress . . . desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 740-41 (1996). The questions regarding what constitutes "threats to transportation" and "threats to transportation security," 49 U.S.C. § 114(f)(2), (3), are subject to TSA's reasonable interpretation. TSA determined that COVID-19 poses a serious threat to the security and safety of the transportation system and that the Mask Directives would help to curtail the spread of the virus and mitigate its adverse effects. TSA's actions adhered to the

decisions of the President, the CDC, and the Acting Secretary of Homeland Security regarding appropriate national policies to address the COVID-19 threats. *See, e.g.*, Security Directive No. 1542-21-01, at 1, *reprinted in* S.A. 18. The only question for this court is whether TSA's action was "within the bounds of reasonable interpretation." *City of Arlington*, 569 U.S. at 296. There is no doubt that it was.

### 1. *The Mask Directives Are a Reasonable and Permissible Response to the Threats Posed by COVID-19*

In issuing the Mask Directives, TSA relied on CDC findings that the risk of transmission of COVID-19 is particularly high in transportation hubs and on conveyances. *See, e.g.*, Security Directive No. 1542-21-01, at 1, *reprinted in* S.A. 18. The CDC has established that the virus spreads "very easily" through inhalation of or contact with "respiratory droplets produced when an infected person coughs, sneezes, or talks." 86 Fed. Reg. 8025, 8028 (Feb. 3, 2021), *reprinted in* S.A. 10. "Travel[] on multi-person conveyances increases" the risk of spread "by bringing persons in close contact with others, often for prolonged periods, and exposing them to frequently touched surfaces." *Id.* at 8029. In these settings, "[s]ocial distancing may be difficult if not impossible." *Id.* The spread of COVID-19 in the transportation system, the CDC has concluded, can aggravate the outbreak in the general population, put passengers and workers at risk, and threaten the "essential" movement of medical providers, the workforce, and goods like food and medicine. *Id.*

As TSA asserts, COVID-19 poses a threat to the operational viability of the transportation system and thus transportation security and safety. Br. of Resp'ts 37-38. Transmission of COVID-19 to transportation workers – from TSA agents to airline crew and airport personnel – imperils

transportation services. The uncontrolled spread of COVID-19 among passengers and these workers can lead to cuts in service that threaten the essential movement of people and goods, and, consequently, our national supply chains, the economy, and national security. TSA has a clear mandate to secure the transportation system against threats that endanger that system's very ability to function. Therefore, TSA is authorized to "develop policies, strategies, and plans for dealing with" COVID-19 to the extent it threatens to disrupt the transportation system. 49 U.S.C. § 114(f)(3). Because the Mask Directives seek to contain this threat, they are in line with the agency's core mission.

In addition, TSA has reasonably determined that COVID-19 is a threat to transportation security and safety because it endangers the lives of large numbers of passengers, transportation workers, and the greater public. Br. of Resp'ts 2, 7-8, 22-23, 36-37. COVID-19 specifically spreads at high rates on transportation, posing a direct and serious risk to many passengers' and workers' lives. Moreover, uncontrolled spread of the highly contagious disease in the transportation system threatens the nation's ongoing efforts to contain the pandemic. For these reasons, we find it "self-evident that the [Mask Directives] are related to the TSA's . . . goals of improving the safety of air travel." *Jifry v. FAA*, 370 F.3d 1174, 1180 (D.C. Cir. 2004). This is not to say that TSA can regulate anything that causes illness or death. However, the scale of death wrought by COVID-19, its established adverse effects on our nation's economy, its specific tendency to spread at high rates in transportation areas, and its threats to persons employed to operate transportation services (as well as to people who use those services), make it a clear threat to transportation security and safety.

18

Finally, in issuing the Mask Directives, TSA relied on the CDC's finding that appropriately worn masks reduce the transmission of COVID-19. 86 Fed. Reg. at 8028-29; *see, e.g.*, Security Directive No. 1542-21-01, at 1, *reprinted in* S.A. 18. In the crowded, tight quarters of airports and aircrafts, face masks "reduce the emission of virus-laden droplets" and "reduc[e] inhalation of these droplets." 86 Fed. Reg. at 8028. The cumulative effect of universal masking, the CDC has found, can "prevent the need for lockdowns" and "protect . . . workers who frequently come into close contact with other people (*e.g.,* at transportation hubs)." *Id.* at 8029. Again, Petitioner does not contest these facts.

Given the threat posed by COVID-19 to the security and safety of the transportation system, it is entirely within TSA's authority to require that masks be worn to contain that threat. To the extent such requirements are an imposition on passengers, as Petitioner suggests, we decline to second-guess TSA's judgment. Br. of Pet'r 6-7; Corbett Affirmation, Ex. A, at 1-2; *see Jifry*, 370 F.3d at 1180. "It is TSA's job—not . . . ours—to strike a balance between convenience and security." *Suburban Air Freight, Inc. v. TSA*, 716 F.3d 679, 683 (D.C. Cir. 2013).

Congress' choice of "broad language" in the Act "reflects an intentional effort to confer the flexibility necessary" for TSA to address yet unknown threats to transportation security and safety as they arise. *See Massachusetts v. EPA*, 549 U.S. 497, 532 (2007). Petitioner contends that the history of the Act, along with TSA's lack of prior regulation aimed at addressing a threat to public health, indicate that the Mask Directives are outside the scope of TSA's authority. Br. of Pet'r 12-15. We disagree.

The Supreme Court has been quite clear in saying that, in applying *Chevron*, "the question in every case is, simply, whether the statutory text forecloses the agency's assertion of authority, or not." *City of Arlington*, 569 U.S. at 301. Thus, "[w]hen Congress delegates broad authority to an agency to achieve a particular objective, agency action pursuant to that delegated authority may extend beyond the specific manifestations of the problem that prompted Congress to legislate in the first place." *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 707 (D.C. Cir. 2011). When creating TSA, "although Congress may not have foreseen the [threat to transportation posed by COVID-19], [section 114(f)]'s expansive language suggests that it intended to give the [TSA] sufficient flexibility . . . [to] pursue the statute's objectives as [threats to transportation] evolve[d]." *Id.* (internal quotations omitted).

Petitioner's invocation of *Alabama Association of Realtors v. Department of Health and Human Services*, 141 S. Ct. 2485 (2021) ("*Alabama Realtors*") (per curiam) in support of his position is unpersuasive. *See* Pet'r's 28(j) Letter (Sept. 14, 2021). There, the Supreme Court found that the CDC lacked the authority to "impose[] a nationwide moratorium on evictions in reliance on a decades-old statute that authorizes it to implement measures like fumigation and pest extermination." *Alabama Realtors*, 141 S. Ct. at 2486. It rejected the CDC's contention that the provision allowed it to act as "necessary" to stop the spread of disease. *Id.* at 2488-89. The first sentence of the statutory provision at issue in *Alabama Realtors* gives the CDC broad powers to stop the spread of disease, while "the second sentence informs the grant of authority by illustrating the kinds of measures that could be necessary: inspection, fumigation, disinfection, sanitation, pest extermination and destruction of contaminated animals and articles." *Id.* at 2488 (discussing 42 U.S.C. § 264(a)). The eviction moratorium was "markedly different" from those

direct actions targeting disease Congress had listed in the provision. *Id.* And allowing the CDC to promulgate whatever measures it deemed "necessary," the Court opined, "would give the CDC a breathtaking amount of authority" such that "[i]t is hard to see what measures this interpretation would place outside the CDC's reach." *Id.*

Petitioner likens *Alabama Realtors* to this case, arguing that the broad grants of authority in 49 U.S.C. § 114(f) and (g) are constrained by the statute's discussion elsewhere of passenger screening, baggage inspections, access control to secure areas, and the like. Pet'r's 28(j) Letter, at 2 (Sept. 14, 2021). Petitioner contends that TSA's powers would be "essentially unlimited" if it were allowed to promulgate regulations on public health, "as virtually any regulation can be framed as 'for your safety.'" *Id.* This is a specious argument.

Petitioner's argument fails for at least two reasons. First, as discussed above, the Mask Directives are in service of both transportation "security" and "safety" and cannot be construed as solely public health regulations. Second, the grant of authority to the CDC in *Alabama Realtors* was found in a single provision, 42 U.S.C. § 264(a), that was controlled and defined by reference to the types of action Congress listed *in that very provision*. 141 S. Ct. at 2488. Petitioner turns the holding in *Alabama Realtors* on its head by asking this court to apply limiting constructions to provisions plainly granting TSA broad authority to act by drawing on entirely separate provisions that appear throughout 49 U.S.C. Chapter 449. *See* Br. of Pet'r 11-13. There is no viable canon of construction that endorses this interpretive approach. *See Helicopter Ass'n Int'l, Inc. v. FAA*, 722 F.3d 430, 435 (D.C. Cir. 2013) (holding that specific statutory provisions amplifying the FAA's regulatory authority merely indicated that Congress intended to address

the matters subject to regulation in several different ways, not to limit the statute's broad grant of authority).

Moreover, contrary to Petitioner's suggestion, TSA will not be at liberty to regulate in any way it deems "necessary" if this court rejects his facial challenge to the Mask Directives. Congress defined the outer bounds of what TSA can do through its careful selection of terms in the Act. The fact that TSA has the power to regulate to contain the threat COVID-19 does not, as Petitioner asserts, give it the power to regulate "warning label requirements for the purpose of preventing cancer" or set speed limits into and out of the airport. Br. of Pet'r 12-13, 18. The examples cited by Petitioner are frivolous because, unlike COVID-19, these matters do not plausibly pose a threat to the security and safety of transportation systems.

"[T]he Mask Directives at issue were designed as part of a government-wide collaborative effort to implement and support enforcement of the CDC's Order in order to counteract the spread of a contagious and life-threatening illness on the nation's planes, trains, buses, and transit systems." Br. of Resp'ts 22-23. The Mask Directives are well within TSA's delegated authority, limited, and reasonably designed to address the "threats to transportation" posed by COVID-19. *See* 49 U.S.C. § 114(f)(2). Therefore, we will not second-guess TSA's expert judgment in adopting the Mask Directives.

*2. TSA Had Additional Delegated Authority to Adopt the Mask Directives Pursuant to its National Emergency Powers*

TSA had additional delegated authority to adopt the Mask Directives once the Secretary of Homeland Security declared a national emergency. 49 U.S.C. § 114(g). Section 114(g) of the Act expressly grants TSA expansive powers and

responsibilities "during a national emergency." *Id.* This includes the authority to "coordinate and oversee the transportation-related responsibilities of other departments and agencies" and to "carry out such other duties, and exercise such other powers, relating to transportation during a national emergency as the Secretary of Homeland Security shall prescribe." 49 U.S.C. § 114(g)(1)(B), (D). The Mask Directives were properly promulgated pursuant to TSA's section 114(g) powers.

In the Department of Homeland Security's emergency determination, the Acting Secretary concluded that the COVID-19 pandemic constituted a national emergency, invoked section 114(g), and directed TSA "to take actions consistent with the authorities in . . . sections 106(m) and 114(f), (g), (l), and (m) to implement the Executive Order to promote safety in and secure the transportation system" against the emergency posed by COVID-19. 86 Fed. Reg. 8217, 8218 (Feb. 4, 2021). The Acting Secretary further specified that TSA should "support[] the CDC in the enforcement of any orders or other requirements necessary to protect the transportation system . . . from COVID-19." *Id.* at 8218-19. These directions from the Acting Secretary expressly authorized TSA to issue the challenged Mask Directives, regardless of whether it already had the power to do so.

## III. CONCLUSION

We hold that the Mask Directives are reasonable and permissible regulations adopted by TSA to promote safety and security in the transportation system against threats posed by COVID-19. We therefore reject Petitioner's claim that TSA's Mask Directives are *ultra vires*, defer to the agency's interpretation of the Act, and deny the petition for review.

KAREN LECRAFT HENDERSON, *Circuit Judge*, dissenting: On the merits, this petition for review is a slam dunk loser. Of course the Transportation Security Administration (TSA), charged with "develop[ing] policies, strategies, and plans for dealing with threats to transportation security," can require individuals in airports and on airplanes to wear the partial face masks we are all familiar with as a result of the coronavirus scourge. 49 U.S.C. § 114(f)(3). But I believe Corbett is so lacking in standing to sue that I would dispose of his petition without reaching the merits.

The three prongs of Article III standing are almost catechismal and Corbett most likely fails all three. He has (1) no cognizable injury that is (2) caused by the TSA's mask mandate and (3) redressable by this court. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). I will stop at the first prong as his challenge should end there.

As my colleagues note, Maj. Op. 5, the CDC mandate and the TSA mandate provide that masks need not be worn for "brief periods" while eating and drinking. *See* 86 Fed. Reg. 8025, 8027 (Feb. 3, 2021); Security Directive No. 1542-21-01 at 3. The TSA mandate adds that "the mask must be worn between bites and sips." Security Directive No. 1542-21-01 at 3. Corbett hangs his injury hat on this added language, fearing that sometime in the future a TSA agent may "swoop in to make sure that he [does] not hesitate for too long in replacing his mask after each bite" and asserting that but for the TSA mask mandate, he "would wear a mask at fewer times." But unlike his mask, Corbett's precariously hung hat falls.[1] It is

---

[1]  Because Corbett brings a facial challenge, Maj. Op. 13, he must show "that the [TSA mandate] injures him in a concrete and particular way," *see Massachusetts v. EPA*, 549 U.S. 497, 517 (2007). Although Corbett alleges he is a "frequent flyer," Br. of Pet'r at 7, it is far from clear when or if he will travel again and thus make himself a specific "object of the [mandate]" any more than the

2

anyone's guess whether Corbett faces "injury" based on any difference between the CDC's mandated "brief periods"—which, significantly, Corbett does not challenge and would follow—and the TSA's mandated "between bites and sips." *See Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011) ("[A]ny petitioner alleging only future injuries confronts a significantly more rigorous burden to establish standing.") (quoting *United Transp. Union v. ICC*, 891 F.2d 908, 913 (D.C. Cir. 1989)). Corbett's allegation that he faces a bona fide threat of future enforcement in his pre-enforcement challenge*, see Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298–99 (1979) (allowing for pre-enforcement standing as long as "there exists a credible threat of prosecution"), is even more fatuous in view of his total failure to allege past enforcement against him or anyone else, *see Muthana v. Pompeo*, 985 F.3d 893, 911 (D.C. Cir. 2021) ("Preenforcement review is not a vehicle to settle questions of statutory interpretation unconnected with matters of constitutional right."), *petition for cert. filed*, No. 21-489 (June 16, 2021).

*De minimis non curat lex*, the "venerable maxim" that ensures the law does not concern itself with trifles, *Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992), resolves Corbett's annoying waste of judicial

---

millions of members of the general public who fly, *see Lujan v. Defs. of Wildlife,* 504 U.S. 555, 561 (1992). Just as a taxpayer cannot mount a challenge so general that his standing is only as a member of the public, *see Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587 (2007), Corbett's generalized injury is likewise insufficient to invoke our jurisdiction, *see Ex parte Levitt*, 302 U.S. 633, 633 (1937) ("[T]o invoke the judicial power . . . [an individual] must show that he . . . is immediately in danger of . . . a direct injury . . . and it is not sufficient that he has merely a general interest common to all members of the public.").

resources; as a lawyer and thus an officer of the court, he should know better.[2] I respectfully dissent.

---

[2] I note that his website is "https://professional-troublemaker.com/."